# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

KATHLEEN S. STIPE,                    )
                                       )
     Plaintiff,              )
                                       )
  vs.                             )      **Case No. 4:06CV1692SNLJ**
                                       )
ERIC K. SHINSEKI,                     )
Secretary of Veterans Affairs,        )
                                       )
     Defendant.              )


## MEMORANDUM

*Pro se* plaintiff has filed this employment discrimination action alleging numerous

instances of discrimination in violation of the Age in Discrimination Act (ADEA), 29 U.S.C.

§621 *et. seq.* and the Rehabilitation Act of 1973, 29 U.S.C. §701 *et. seq.*[1]  This matter is before

the Court on defendant Secretary's motion for summary judgment[46], filed September 11, 2009.

All responsive pleadings, including plaintiff's amended response, have now been filed and the

matter is ripe for disposition.

Courts have repeatedly recognized that summary judgment is a harsh remedy that should

be granted only when the moving party has established his right to judgment with such clarity as

not to give rise to controversy.  New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th

Cir. 1977).  Summary judgment motions, however, "can be a tool of great utility in removing

---

[1]Plaintiff's original complaint named the Department of Veterans Affairs (VA) and several individual VA employees as defendants; as well as asserting a claim under the Americans with Disabilities Act (ADA), 42 U.S.C. §12101 *et. seq.*  The Court dismissed defendant VA, the individual defendants, and the ADA claim.  *See*, Court Order [24], filed April 6, 2007.  Thus, the current claims before the Court are solely against Secretary Shinseki (substituted for former Secretary of Veterans Affairs R. James Nicholas) and for alleged violations of the ADEA and the Rehabilitation Act.

factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." Mt. Pleasant v. Associated Elec. Coop. Inc., 838 F.2d 268, 273 (8th Cir. 1988).

Pursuant to Fed.R.Civ.P. 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467, 82 S. Ct. 486, 7 L.Ed.2d 458 (1962). The burden is on the moving party. Mt. Pleasant, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).

In passing on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir. 1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 210 (8th Cir. 1976). Although summary judgment should seldom be granted in employment discrimination cases, it is proper in those cases wherein the plaintiff fails to establish a factual dispute on an essential element of the case. Snow v. Ridgeview Medical Center, 128 F.3d. 1201, 1205 (8th Cir. 1997), citing Bialas v. Greyhound Lines, Inc., 59 F.3d. 759, 762 (8th Cir. 1995). "Although summary

judgment is to be used sparingly in employment discrimination cases, it is appropriate where one party has failed to present evidence sufficient to create a jury question as to an essential element of its claim." Whitley v. Peer Review Sys., Inc., 221 F.3d. 1053, 1055 (8th Cir. 2000)(citations omitted). The Eighth Circuit has "repeatedly cautioned that summary judgment should seldom be granted in the context of employment actions, as such actions are inherently fact based. Summary judgment is not appropriate unless all the evidence points one way and is susceptible to no reasonable inferences sustaining the position of the nonmoving party." Hindman v. Transkrit Corp., 145 F.3d. 986, 990 (8th Cir. 1998)(citations omitted); see, Mayer v. Nextel West Corp., 318 F.3d. 803, 806 (8th Cir. 2003) citing Keathley v. Ameritech Corp., 187 F.3d. 915, 919 (8th Cir. 1999). However, it is clear that to survive summary judgment, a plaintiff must support his/her allegations with sufficient probative evidence to permit a finding in the plaintiff's favor based upon more than mere speculation, conjecture, or fantasy. Putnam v. Unity Health Systems, Inc., 348 F.3d. 732, 733-34 (8th Cir. 2003) quoting Wilson v. Int'l Bus. Mach. Corp., 62 F.3d. 237, 241 (8th Cir. 1995); Girten v. McRentals, Inc., 337 F.3d. 979, 982 (8th Cir. 2003)(plaintiff's theory of age discrimination failed "[b]ecause this theory is supported more by contentions and speculation than evidence, it is insufficient to withstand summary judgment.").

Although the Court is required to view the facts in the light most favorable to the non-moving party, it should not accept "unreasonable inferences or sheer speculation as fact.". Howard v. Columbia Public School District, et. al., 363 F.3d. 797, 800 (8th Cir. 2004). A plaintiff may not "simply point to allegations made in [her] complaint but must identify and provide evidence of `specific facts creating a triable controversy." Howard, at 800 quoting Jaurequi v. Carter Manufacturing Co., 173 F.3d. 1076, 1085 (8th Cir. 1999). Furthermore, a plaintiff may not simply provide a massive record expecting the Court to sift through it in an

effort to find support for the plaintiff's allegations. <u>Howard</u>, at 800-01 (citations omitted). The Court is only obligated to consider "admissible evidence and disregard portions of various affidavits and depositions that were made without personal knowledge, consist of hearsay, or purport to state legal conclusions in fact.". <u>Howard</u>, at 801 *citing* <u>Shaver v. Independent Stave Co.</u>, 350 F.3d. 716, 723 (8th Cir. 2003).

Before setting forth the Court's findings of fact, the Court must address the plaintiff's amended response[61] which appears to be a combination of cited administrative regulations and caselaw, as well as her "responses" to the defendant's statement of uncontroverted material facts [49]. As noted by the defendant in his reply brief [64], plaintiff's revisions still do not set forth proper factual responses as required under Local Rule 4.01(E) nor do they raise any genuine issues of fact.[2] Even as revised, for example, plaintiff's responses to defendant's factual statement numbers 1-16, 28, 29, 32, 33, 35, 37, 38, 39, 40-43 fail to contain any reference to the evidentiary record before the Court. Many of the plaintiff's revised responses are nothing more than her unsupported speculations, argument, or some type of legal conclusion; for example, her responses to defendant's factual statement numbers 16, 17, 28, 29, 33, 34, 36, 37, 39, and 44. As to #34, plaintiff simply states "**See Plaintiff's Exhibit BB**". This is not acceptable to the Court. Thus, the Court finds the following facts not in dispute or resolved by the Court based upon the evidentiary record before it. The following facts are those established by the administrative record, the written transcriptions of administrative proceedings, affidavit(s), and other

---

[2]It appears that the only factual statement numbers still undisputed are 8, 20, and 21.

miscellaneous documents submitted by the parties, and said evidence viewed in the light most favorable to the non-movant (plaintiff).[3]

## Administrative Review History

Plaintiff Stipe, during the relevant time-period, was employed by the VA as an Education Case Manager, GS-10, Education Customer Service Division, Veteran's Affairs Regional Office in St. Louis, Missouri. On or about June 5, 2004 plaintiff filed a formal EEO complaint alleging disability discrimination due to a hostile work environment. Gov. Exhibit A.[4] Pursuant to her request, the EEO allowed plaintiff to amend her complaint in January 2005 to include additional instances of alleged harassment due to her "disability". Gov Exhibit B. On March 30, 2005 the plaintiff again amended her EEO complaint to add claims of age discrimination and retaliation (for the filing of an EEO complaint). Gov. Exhibit C.

The VA's Office of Resolution Management (ORM) conducted "an appropriate investigation" of the plaintiff's complaint in its entirety. Upon completion of its investigation, the ORM forwarded its investigative file to the VA's Office of Employment Discrimination Complaint Adjudication (OEDCA). On or about August 22, 2005, the VA issued its Final Agency Decision (FAD) regarding the plaintiff's mixed EEO complaint. Gov. Exhibit D.

---

[3]The administrative record in this matter is voluminous, as are the "exhibits" submitted by the plaintiff. For judicial economy and efficiency, the Court will cite to specific exhibits when needed. In instances wherein both parties have filed the same exhibit, the Court will cite to only one submission, and should not be taken as any indication of bias by the Court in its review and analysis.

[4]It has come to the Court's attention that plaintiff's response [54], as delivered to the defendant, did not include tabbed exhibits identifying each exhibit; i.e. only the Court's courtesy copy has each of the plaintiff's exhibits individually tabbed. Thus, the Court will reference the defendant's exhibits most often. However, when referencing the plaintiff's exhibits, the Court will reference them by the exhibit letter plaintiff gave said exhibit and also substantively identify the exhibit so that the defendant is aware of which exhibit is being discussed.

In its FAD, the VA addressed each of the plaintiff's thirty-two (32) instances/claims of discrimination and concluded that she had failed to establish that she was discriminated against based on age, disability, or reprisal. Among other things, it found that plaintiff was chronically tardy, had made a physical threat against a supervisor, had been accommodated (for an alleged back problem) by allowing plaintiff to choose her "tour of duty" and allowed time to stand by her desk (as opposed to sitting for extensive periods of time), and was not subjected to any slurs or objectionable language.

Plaintiff appealed the FAD to the Merit Systems Protection Board (MSPB), which reviewed the adverse agency charges of plaintiff's excessive unexcused tardiness and disrespectful conduct on non-discrimination grounds.[5]  Gov. Exhibit E.  In its initial decision, the MSPB upheld the VA's adverse employment actions of disciplining the plaintiff, and ultimately, terminating her employment as an appropriate response to the plaintiff's conduct.  As for the plaintiff's age, disability and retaliation discrimination claims, the MSPB found that the plaintiff had failed to support any of her claims of discrimination.

Plaintiff then filed a petition for review of the MSPB's initial decision with the full Board.[6]  On or about August 2, 2006, the MSPB issued its final decision.  Gov. Exhibit F.  The MSPB (full Board) found no new significant evidence to consider or any error of interpretation

_____

[5]The initial review of the FAD, on behalf of the MSPB, was conducted by Administrative Judge Stephen E. Manrose. He held a hearing over a four-day period reviewing all documentary and testimonial evidence in this matter. Plaintiff was represented by William M. Tyler, Jr.  It is unclear from the record before the Court whether Mr. Tyler is an attorney or a union representative.  However, the Court notes that in testimony before EEO Investigator Angela Myers, plaintiff refers to a "Mr. Bill Taylor" as "the union president".  Gov. Exhibit I, pg. 12.

[6]The full Board consisted of Neil A.G. McPhie, Chairman; Mary M. Rose, Vice-Chairman; and Barbara J. Sapin, Member.  Again, the plaintiff was represented by William M. Tyler, Jr.

of law or applicable regulations in the MSPB administrative judge's initial decision. The MSPB denied the plaintiff's petition for review.

Plaintiff then appealed to the EEOC Office of Federal Operations (OFO) for review of the MSPB's final order. On October 17, 2006, the OFO issued its decision concurring with the factual and legal findings of the MSPB. It specifically found that plaintiff was not the subject of discrimination and that the MSPB decision reflected the correct interpretation of applicable laws, regulations, and policies and was supported by substantial evidence in the record. Gov. Exhibit G. Having exhausted her administrative remedies, plaintiff filed her original complaint before this Court on November 21, 2006. On or about January 8, 2007, plaintiff filed her amended complaint.

## Excessive Tardiness and Disrespectful Conduct

During the relevant time-period, Scott Nordmoe was the VA Regional Office Education Customer Team Coach in St. Louis, Missouri. Mr. Nordmoe was the plaintiff's direct supervisor. Gov. Exhibit H - Declaration of Scott Nordmoe. Nordmoe was part of the management team that originally hired the plaintiff as a VA education case manager. After plaintiff completed her initial six-month training and certification period, Nordmoe promoted her to a GS-10 case manager position.

As the Education Customer Services Team Coach, Nordmoe managed a team of VA education case managers in the customer service call center in St. Louis. Plaintiff was one of these team members in St. Louis. Nordmoe's team serviced claims in a sixteen (16) - state region, fielding on average between 1200 and 1500 veteran claims telephone calls per day.

The VA Education Customer Service telephone system was operational from 7:00 a.m until 5:00 p.m. each day to receive telephone calls from VA customers. Employees on the

plaintiff's team could choose their daily work schedule, or "tour of duty". The earliest tour a team member could select began at 6:30 a.m. and ended at 3:00 p.m. The latest tour a team member could select began at 9:30 a.m. and ended at 6:00 p.m. Along with a choice of a tour of duty, the Education Customer Service team was offered a flexible schedule. Therefore, an employee with a tour of duty from 6:30 a.m. to 3:00 p.m. had a core start time of 6:45 a.m. which allowed the employee to report daily between 6:30 a.m. and 7:00 a.m., and their work day would end 8.5 hours after the time in which they had arrived. An employee with a tour of duty from 9:30 a.m. to 6:00 p.m. had a core arrival time of 9:15 a.m. which allowed the employee to report daily between 9:00 a.m. and 9:30 a.m., and their work day would end 8.5 hrs after the time in which they had arrived. Gov. Exhibit H. No employee was required to work any particular tour of duty by either Nordmoe or pursuant to VA policy as long as there were sufficient case managers available during the telephone system's hours of operation. While management may have asked case managers if they were interested in working a different tour of duty, no employee, including the plaintiff, was denied selection for a case manager position based upon their chosen tour of duty.

Each employee was required to select a core time and stay within those time frames on a daily basis. In order to alter those hours, an employee had to request a core time change to the supervisor, and the supervisor would approve or disapprove the change based upon staffing needs and workloads.

Regardless of which tour of duty an employee chose, every education case manager was required to perform 5.5 hours of telephone claim work during each 8-hr workday. This requirement was the VA national performance standard. Gov. Exhibit H. Time not spent on the telephone answering claim calls was considered to be "down time" or "non-telephone related

work activities" in which an employee could attend meetings, attend to union duties, attend training, take breaks, or process claims. Nordmoe routinely granted down time requests for employees to attend mandatory meetings or for other reasons. Attendance at such meetings relieved the employee of the required telephone claim work during such attendance. Plaintiff requested, and was granted, down time to attend all meetings that were required of her by VA management. Gov. Exhibit H.

Plaintiff requested to work a 9:30 a.m. to 6:00 p.m tour of duty, and Nordmoe approved her request. During her tour of duty, plaintiff had from 9:30 a.m. until 5:00 p.m.,or seven (7) hours of telephone system operation time (excluding 30 minutes for lunch) to meet the required 5.5 hrs telephone claim work.

In order to provide optimal customer service, it was important for team members to be on time and for Nordmoe to have advanced notice of absences. If a team member was late or absent, other case managers had to handle that employee's case load. Advance notice of lateness or absence enabled Nordmoe to make adjustments to the work schedules in order to handle the daily call volume with available personnel.

Each January, Nordmoe requested that all education case managers on his team project and schedule all anticipated extended leave (anything over 3 days) that they planned to take for the year. Any extended leave that had not been noted by an employee was considered to be "unscheduled"leave. Furthermore, any other leave of less than 3 days that was not requested in advance of the day the leave was taken was also considered to be "unscheduled" leave. Nordmoe routinely granted "unscheduled" leave requests as long as such requests were not excessively requested, and available staff could handle the additional workload.

At all times relevant to this cause of action, plaintiff's alleged disabilities were dwarfism[7], spinal stenosis, and vertigo. As of March 2003, plaintiff was allowed to use a scooter in the workplace on a regular basis. Also during the relevant time-period, plaintiff was allowed to use a handicap parking space. Gov. Exhibit I, pgs. 4-5, 9.

On March 5, 2004 Nordmoe verbally counseled plaintiff regarding her frequent requests for unscheduled annual leave. Gov. Exhibit I, pgs. 36-37. Nordmoe informed her that the unscheduled leave requests had caused a significant amount of instances of tardiness and stressed the importance of coming to work in a timely fashion every day. He further informed her that he would give her the following pay period to show improvement in her leave usage.

Plaintiff continued to make numerous unscheduled requests to cover her tardiness; between March 5 and April 16, 2004, plaintiff requested leave for tardiness on March 25, March 31, April 1, April 2, April 5, April 8, April 12, April13, and April 14, 2004. Despite the number of requests, Nordmoe granted them hoping that plaintiff's attendance would improve. However, by April 16, 2004 Nordmoe considered the situation becoming excessive and no longer tolerable. On April 16, 2004 he issued plaintiff a written counseling memorandum and advised her that he would no longer routinely grant her annual leave for tardiness and that future instances of tardiness risked being unexcused. Gov. Exhibit H; Gov. Exhibit I, pg. 35; and Gov. Exhibit Q. Plaintiff was warned that future annual leave requests would be approved at the discretion of management based upon the reason(s) for the request. He further advised plaintiff that she would be charged as AWOL for unjustified leave requests. Gov. Exhibit H; Gov. Exhibit Q. Finally,

---

[7]Whether dwarfism is considered to be a "disability" from a social-cultural standpoint is immaterial. Furthermore, the Court discerns from the pleadings that the question of whether plaintiff's dwarfism is a "disability" under the Rehabilitation Act is not disputed.

plaintiff was informed that she "may be put on a sick leave restriction, if we determine you have a pattern of sick leave abuse." Gov. Exhibit Q.

Plaintiff was tardy on April 27, April 28, May 7, May 13, May 14, May 17, May 18, May 19, May 20, May 21, May 24, and May 26, 2004. She requested Family-Friendly sick leave for those days, and her requests were granted. Gov. Exhibit H. On May 5, 2004 plaintiff arrived late due to a scheduled doctor's appointment and requested unscheduled sick leave. Her unscheduled sick leave request was granted. Gov. Exhibit H.

On April 28, 2004 plaintiff was issued a proposed reprimand for three (3) charges of unexcused tardiness on April 19, April 20, and April 22, 2004 for which she was designated as AWOL. On May 18, 2004 the charges in the proposed reprimand were sustained but the reprimand was downgraded to an admonishment. Nordmoe had denied plaintiff's request for unscheduled leave on these dates and charged plaintiff as being AWOL because of her history of excessive tardiness and failure to comply with the conditions set by Nordmoe's verbal and written counseling. Gov. Exhibit H.

On June 21, 2004 plaintiff was issued a proposed reprimand containing one (1) charge of unexcused tardiness specifying twelve (12) instances of tardiness between April 26 and June 14, 2004[8]; and one (1) charge of AWOL for failing to report to work on June 7, 2004[9]. Gov. Exhibit N, pgs. 5, 6; Gov. Exhibit T. On July 7, 2004, after reviewing plaintiff's history of unscheduled leave requests and her response to the proposed reprimand issued to her on June 21 by Nordmoe,

_____

[8]April 26, April 29, April 30, May 4, May 7, May 10-12, June 3, June 9, June 10, and June 14, 2004.

[9]Between March 29, 2004 and June 21, 2004 plaintiff had arrived to work on time only nine (9) times. Gov. Exhibit H.

Douglas Bragg (VA Regional Office Education Officer in St. Louis, Mo.) upheld the proposal, and issued the reprimand. Plaintiff refused to sign the reprimand. Gov. Exhibit T.

On July 23, 2004 Bragg issued plaintiff a proposed three (3)-day suspension for her unexcused tardiness on June 24, 2004, unexcused absence for almost 2 hours on June 24, 2004; and unexcused tardiness on July 23, 2004. Gov. Exhibit H; Gov. Exhibit J, pg. 19, and Gov. Exhibit U. Bragg proposed the suspension because of plaintiff's continuing pattern of tardiness despite disciplinary actions.

On or about August 25, 2004 plaintiff was offered "alternate discipline" wherein she would be suspended for three (3) days with pay and would not be placed on non-duty status. Gov. Exhibit J, pgs. 21-24; Gov. Exhibit N, pg. 12. Plaintiff declined the offer of "alternate discipline" because she believed it would interfere with her rights to file an EEO grievance or claim. Gov. Exhibit J, pgs. 21-24. On September 8, 2004, after reviewing plaintiff's employee file and her responses to the proposed suspension, David Unterwagner (Assistant Director of the VA Regional Office in St. Louis, Missouri) upheld the proposed suspension because two (2) of the three (3) charges had to do with unexcused tardiness, and plaintiff had a continuing pattern of chronic unexcused tardiness. Gov. Exhibit O-1, pgs. 8-9; Gov. Exhibit U.

On September 7, 2004 Nordmoe notified plaintiff that she was being placed on sick leave certification for a period of six (6) months for unacceptable use of sick leave to cover her excessive tardiness. Gov. Exhibit H. Effective September 7, 2004 Nordmoe required plaintiff to submit a medical certification from her health care provider for each absence and sick leave request. This medical certification had to include a clear statement that she was incapacitated to perform her duties during the entire period of the absence. Gov. Exhibit R. Nordmoe believed that this requirement was in compliance with the Master Agreement, Article 32 which provided

that an appropriate use of sick leave is that the employee is incapacitated to perform his or her duties.[10] Plaintiff was further notified that her absences would be classified as AWOL until such medical certification was deemed acceptable and that failure to comply with these conditions, or further excessive absenteeism, could result in disciplinary action. Gov. Exhibit H.

On October 14, 2004 plaintiff was issued a proposed fourteen (14)-day suspension for instances of unexcused tardiness on August 4, August 18, August 20, August 27, August 30, September 7, October 6, October 12, October 13, and October 14, 2004. Gov. Exhibit H; Gov. Exhibit. Nordmoe had denied plaintiff's unscheduled leave requests for these dates and charged her with being AWOL because of her history of excessive tardiness and continuing non-compliance with prior leave request requirements. Gov. Exhibit H. The proposed 14-day suspension was issued by Bragg. On November 10, 2004, after reviewing all the evidence in connection with these instances of unexcused tardiness and plaintiff's October 29, 2004 reply to the proposed suspension, Unterwagner upheld the suspension. Gov. Exhibit V.

Plaintiff continued to engage in instances of tardiness. Between October 15 and December 14, 2004, Nordmoe denied plaintiff's requests for unscheduled leave, cited her for sixteen (16) instances of unexcused tardiness and charges of being AWOL: October 15, October 19, October 21, October 25, October 26, October 27, October 28, October 29, December 3,

---

[10]The Court has examined both parties' numerous exhibits and is unable to locate an exhibit evidencing the "Master Agreement". For purposes of the instant motion, the Court assumes that this is a some type of collective bargaining agreement applicable to the parties; and since plaintiff does not dispute the existence of the "Master Agreement" (in fact, throughout her correspondence to various persons at the VA and the agency reviews of the adverse employment actions, she refers to and relies on the "Master Agreement") or that Article 32 provides that an appropriate use of sick leave is that the employee is incapacitated to perform his or her duties, the Court will consider the references to these matters as uncontroverted.

December 6, December 7, December 8, December 10, December 13, December 14, 2004, and December 15, 2004.

On October 20, 2004 plaintiff was issued a proposed admonishment by Ms. Louise Wright (Assistant Education Program Chief) for disrespectful conduct. In the proposed admonishment, Ms. Wright refers to an encounter on October 15, 2004 in which she and plaintiff entered into a conversation outside a manager's office (Carl Thunell's) which quickly escalated into a heated and confrontational encounter with the plaintiff. Ms. Wright avers that despite repeated advisements to plaintiff to return to her desk because the conversation taking place in a loud manner in the Education Customer Service Section outside Mr. Thunell's office was "inappropriate", plaintiff continued to "raise your voice and argue". Gov. Exhibit W. On November 16, 2004, this admonishment was upheld by Bragg.

Under the Master Agreement, reprimands and admonishments remain in an employee's Official Personnel Folder (OPF) for six (6) months, and after that time, the employee may request that they be removed from the file. Gov. Exhibit J, pgs. 61-62. The VA is not required to remove reprimands and admonishments from an employee's file. Gov. Exhibit J, pg. 62. On December 8, 2004 plaintiff filed a formal request to have the proposed reprimand of May 14, 2004 and the admonishment of May 18, 2004 removed from her OPF.[11] Plaintiff's Exhibit S - copy of email sent to Ms. Wright regarding removal of the May 14 and May 18, 2004 disciplinary actions and Ms. Wright's email response. Ms. Janet McDonald was the Human Resources Liaison who advised plaintiff's supervisors regarding plaintiff's request to remove

_____

[11]This proposed reprimand and admonishment were made in connection with an incident involving plaintiff's refusal to remove her car from her handicap parking space to another space temporarily in order to allow maintenance to complete work encroaching on the space. This incident will be detailed further in this memorandum.

these disciplinary actions from her OPF.  Gov. Exhibit P-1.  Ms. McDonald advised management that if the purpose of the disciplinary actions were served, plaintiff's May 2004 reprimand and admonishment could be removed from her OPF; otherwise, management could deny her request and leave them in her OPF.  Gov. Exhibit P-1.  Ms. Wright decided to deny the plaintiff's request and leave the May 2004 reprimand and admonishment in the plaintiff's OPF.  Ms. Wright believed that since the reprimand and admonishment were for failing to follow a direct order and tardiness, and the plaintiff's conduct had not changed since May 2004 in these areas, the purpose of the disciplinary actions (to change plaintiff's behavior) had not been served.  Gov. Exhibit M-1, pgs. 10-11.

### Termination from employment

On or about October 19, 2004 Bragg received a report from one of plaintiff's co-workers that plaintiff had been overheard threatening to kill Nordmoe.  On October 20 and 21, 2004 Bragg interviewed the plaintiff and four (4) other employees.  Plaintiff admitted to be extremely angry with Nordmoe over the denials of her leave requests, and that she had only stated that she wished she knew where Nordmoe lived so she could follow him home to talk to him.  Gov. Exhibit N-1, pgs. 23-25.  Information from plaintiff's co-workers indicated that plaintiff had made a threatening statement with regard to Nordmoe.

On December 22, 2004 plaintiff was notified that she was being proposed for removal from her employment for continuing unexcused tardiness and disrespectful conduct and disruption of the workplace.  Gov. Exhibit X.  The removal proposal highlighted the sixteen (16) instances of tardiness from October 15 through December 15, 2004; as well as the threatening statement towards Nordmoe made on October 19, 2004.

On December 23, 2004 plaintiff sent Nordmoe, late in the day, an email requesting additional down time for that day in order to fashion her response to the proposed removal. Nordmoe did not see the e-mail until the next day and then approved her request for six (6) hours of down time instead of the requested eight (8) hours. There was some confusion as to whether all of the down time requested was in connection with the proposed removal response, or whether two (2) of the hours were in connection with a prior approval by Nordmoe for union activities which was later denied by Bragg. Ultimately, the matter was cleared up, the two (2) hours of down time was restored for the union activities, and the entire eight (8) hours was approved for plaintiff to respond to the proposed removal. Gov. Exhibit H; Gov. Exhibit K, pgs. 18-21; Gov. Exhibit N-1, pgs. 6-8.

On February 9, 2005 Unterwagner, in writing, informed plaintiff that she was being removed from her employment with the VA, effective February 14, 2005. Unterwagner approved the proposal to remove plaintiff from her employment on the basis of her excessive unexcused absences/tardiness and for the disrespectful conduct and disruption of the workplace in connection with the verbal threat of October 19, 2004. Gov. Exhibit Y. Unterwagner believed that plaintiff's unexcused absences were excessive and removal was appropriate pursuant to the VA's recommended penalty for excessive unexcused tardiness. Gov. Exhibit O, pgs. 21-22.

As the Human Resources Liaison officer, Ms. McDonald provided plaintiff with the required paperwork to apply for disability retirement. Gov. Exhibit P-2, pg. 26. Upon receipt of plaintiff's paperwork, Ms. McDonald noted that it was incomplete because plaintiff had not selected how she wanted her annuity paid nor had she designated a financial institution for direct deposit. In addition, plaintiff did not submit any physician statement to support her disability retirement claim. On February 23, 2005, Ms. McDonald sent the uncompleted application

package back to plaintiff noting the areas that needed to be completed, and informed her that she needed to return the completed application within thirty-one (31) days of the date of her separation. Plaintiff's separation date was February 14, 2005, not the date of the notice of removal (February 9, 2005). Gov. Exhibit P-2, pgs. 26-28. If plaintiff did not return the completed application within the 31-day deadline, plaintiff would have to apply directly for disability retirement though the Office of Personnel Management, and not through the VA's regional office. Ms. McDonald received plaintiff's completed application within the 31-day deadline, and it was processed according to VA policy and procedure. Gov. Exhibit P-2, pgs. 27-28.

### Incident Regarding Handicap Parking Space

Plaintiff was allowed to park in one of two (2) handicapped parking spaces or in a shed adjacent to the building in which the VA Claims Processing Center was located. These spaces are not reserved for any particular individual; i.e. the two (2) marked spaces were for the use of six (6) disabled employees on a first-come, first-served basis.

On April 13, 2004 one of the handicapped parking spaces was already occupied. Balke, the company that owned and managed the building that houses the VA Claims Processing Center, placed a construction cone in the open handicapped space in order to perform maintenance to the parking space; repair work on a concrete buffer at the front of the space. When plaintiff arrived late for work at approximately 10:00 a.m., she moved the cone and proceeded to park her van in the parking space. Upon request of Balke, Nordmoe told plaintiff to move her van to an available spot in the shed. Plaintiff refused. Gov. Exhibit H; Gov. Exhibit I, pgs. 18-24. Plaintiff was thereafter given a direct order by Carl Thunell (VA Regional Office Education Customer Service Chief in St. Louis, Missouri) and Ms. Wright to move her car.

Plaintiff again refused, questioning the "motive" for having her move her car and demanding a written order or explanation regarding the removal of her car from the handicapped parking space. Gov. Exhibit H; Gov. Exhibit I, pgs. 18-24. Eventually, a compromise was reached and plaintiff was allowed to pull her car back from the front of the parking space sufficient for Balke to have access to the concrete barrier to do its repair work. Agency policy states that when a supervisor issues a direct order, it is not required to be in writing. Gov. Exhibit M.

On May 14, 2004, plaintiff was issued a proposed reprimand regarding her refusal to follow the direct orders of Thunell and Wright regarding moving her van from the handicapped parking space on April 13, 2004. On May 18, 2004 the proposed reprimand was made into a formal admonishment.

### Promotion regarding Senior Veterans Claims Examiner

In the fall of 2004 plaintiff applied for a position as Senior Veterans Claim Examiner. Adam Giraudo, as the VA Human Resources Specialist, facilitated the promotion panel reviewing these applications. Giraudo removed the names from the applications so that panel members could not identify the applicants. Gov. Exhibit P-1, pgs. 19-22. Nordmoe was one of several members of the promotion panel reviewing and scoring the applications. Gov. Exhibit H. The panel members each assigned a numeric score to each applicant based on the applicant's responses to a series of questions. Nordmoe's role as a panel member was limited to scoring the sanitized applications based upon the applicants' written answers to questions and their qualifications for the position. After the panel had scored the applications, the VA Human Resources Department tallied the applicants' scores, ranked the applicants accordingly, and decided how may applicants were qualified to be interviewed for the promotion. Gov. Exhibit H; Gov. Exhibit P-1, pgs. 19-22. Specifically, Giraudo tallied the scores given by the panel

members, and the Human Resources Department made the determination of who would be referred for selection. Plaintiff qualified but did not rank high enough to be referred for final consideration. Plaintiff's Exhibit FF (and CCC) - memorandum dated October 15, 2004 from Adam Giraudo.

### Plaintiff's Requested Accommodations

On December 27, 2004 plaintiff requested, in writing, that she be allowed to work a part-time schedule between the hours of 10:00 a.m. and 6:00 p.m., or that she be reassigned as a Senior Veterans Claims Examiner or similar GS-10 position due to her alleged disabilities of "spinal stenosis, degenerative arthritis, and dwarfism". Gov. Exhibit Z. In her written request to Nordmoe, plaintiff contends that "[T]his accommodation is necessary because my disability prevents me from arriving to work by 9:30 a.m. every day due to its effect on my ability to drive safely". She further contends that her "disability" affects her life activities of walking and dressing and concludes that such interference "qualifies as a disability which is interfering with the performance of duties." Gov. Exhibit Z. Further, plaintiff contends that "[I]n addition, you have provided me with numerous disciplinary actions involving my `ability to arrive at work on time' which proves that my disability is indeed affecting my ability to perform my work." Gov. Exhibit Z. Plaintiff gives no further explanation how any one of her referenced disabilities prevents her from being at work on time, or how working part-time will encourage her to be at work on time (even on a part-time schedule). Finally, plaintiff informs Nordmoe that she will be applying for "Federal disability retirement benefits". Gov. Exhibit Z.

The Education Customer Service Center, where plaintiff worked, was and had always been staffed by full-time employees; it did not (during the relevant time-period) have part-time employees. Gov. Exhibit H. No employees in the plaintiff's division worked part-time because

a part-time schedule would be counter-productive to the increase in workload due to prior staffing cuts and the need to maintain the VA's national performance standard. Two employees, Jean Tobias and Kim Faulk, formerly worked part-time on the Claims Processing team[12] (not the Customer Service team of which plaintiff was a member); however as workload increased, those part-time arrangements were terminated. There were no part-time employees in plaintiff's division as of June/July 2004. Gov. Exhibit N-1, pgs. 14-15.

On January 5, 2005 Janet McDonald, VA Human Resources Liaison, wrote the plaintiff regarding her December 27, 2004 accommodation request. Gov. Exhibit Z-1. Ms. McDonald acknowledged the plaintiff's request and the fact that no medical documentation was provided demonstrating a need for the requested accommodation. Ms. McDonald provided plaintiff with a detailed list of the information her office needed in order for management to "make a determination as to whether you are a qualified individual with a disability as defined by the Rehabilitation Act." Gov. Exhibit Z-1.

On January 27, 2005 plaintiff responded to Ms. McDonald's request for medical documentation supporting her accommodation request. Plaintiff was perturbed by Ms. McDonald's letter and stated her belief that no further medical documentation was necessary.

> "Please take particular note of the letter from Mr. Doug Smith dated September 6, 2001 indicating that since I had `already established my disability', I did not need to supply any further medical information to support my request for a reasonable accommodation. Since my disability has been established with the Department of Veterans Affairs since April 2000, I really did not see any need to put me through obtaining additional medical documentation."

Gov. Exhibit Z-2. However, plaintiff did decide to provide "**once again,** a complete history of

---

[12]These two (2) employees requested part-time for non-disability reasons. Gov. Exhibit N-1, pgs. 14-15.

the documentation that the Department of Veterans Affairs should have already had on file for me, in addition to more recent medical evidence which indicates that my medical disabilities will not change in the near future."  Gov. Exhibit Z-2.  Plaintiff attached to her January 27, 2005 response two (2) letters from health care providers.  One (1) letter dated January 18, 2005 is from Marsha K. Mertens, M.D.   In it, Dr. Mertens states:

> "This letter is to confirm that Kathleen suffers from severe lumbar
> spinal stenosis which causes pain and numbness if she sits for periods
> longer than one hour.  Please make Accommodations for her so that she
> is able to take brief breaks from her desk work.
> I am also confirming that she was treated with hydroxyzine beginning
> 9/24/09 for a bite on her leg.  This drug is quite sedating and likely
> contributed to her lateness in the month following."

Gov. Exhibit Z-2.  The other letter was from Donna Waldo, a nurse in the office of Robert F. Morgan, M.D.  In this letter, Ms. Waldo states:

> "Kathleen's condition of vertigo, spinal stenosis, and dwarfism does
> not appear that it will change in the near future.
> Due to the vertigo the patient states she has, she wakes up dizzy and
> unable to drive.  She states this interferes with her ability to dress,
> walk, and drive."

Gov. Exhibit Z-2.  Neither of the letters addresses plaintiff's dwarfism or explains, in medical terms, why plaintiff's "disabilities" require her to work part-time or be reassigned to a Senior Veterans Claims Examiner position.  Neither of the letters specifically identifies which of the plaintiff's duties she is unable to perform due to her alleged "disabilities".  Neither of the letters provides any detailed description of the precise accommodation "recommended by your health care provider[13], including the basis of the recommendation and an explanation of how the

---

[13]Dr. Mertens does note plaintiff's back pain and requests that plaintiff be allowed to take "brief breaks from her desk work."  This accommodation request will be address shortly.

proposed accommodation will allow you to perform the particular job duty at issue."  Gov.

Exhibit Z-1, pg. 2.

On February 1, 2005 Bragg responded to the plaintiff's reasonable accommodation

request for a part-time work schedule or reassignment to a Senior Veterans Claim Examiner

position.  Gov. Exhibit Z-3.  Upon review of the plaintiff's letter and her submitted medical

documentation, Bragg denied the plaintiff's request in concluding:

> "[S]pecifically, I could find nothing in the materials you
> submitted demonstrating specific duties of your job that you
> are unable to perform as a result of your medical conditions.
> You also requested reassignment to Senior VCE position.  I
> can not consider assigning you to a Senior VCE position
> because its journey-level grade is GS 11.  Such an
> assignment must be filled competitively.
>
> The medical statement from Dr. Mertens dated January 18, 2005
> does recommend that Management allow you to `take brief breaks
> from her desk work' but does not mention that you are unable to
> perform your duties as a result of the condition you cited.  I have
> instructed your supervisor to work with you to determine the logistics
> necessary to facilitate you performing your duties without sitting for
> periods of longer than an hour.
>
> In addition, I was unable to find anything in the medical information
> that you furnished suggesting the need for you to work part time to
> accommodate your medical conditions."

Gov. Exhibit Z-3.

Bragg informed Nordmoe of management's approval of accommodating plaintiff's back

pain by allowing her to stand approximately 5-10 minutes for every hour sitting at her desk.

Gov. Exhibit H; Gov. Exhibit N-1, pgs. 15-16.  Nordmoe had no objection to this request;

however, plaintiff never approached Nordmoe about implementing this accommodation.  Gov.

Exhibit H; Gov. Exhibit N-1; pgs. 16-17.

Despite plaintiff's attempt, via her amended response to the defendant's summary judgment motion, to modify her claims before the Court[14], the claims presently before the Court are as follows:

1) The VA subjected the plaintiff to disparate impact age discrimination because the late-shift employees on the Education Customer Service Team, of which plaintiff was a member, were over age 40 and were required to perform telephone client contact for 76.9 percent of their shift. Plaintiff contends that employees on the earlier shift only had to perform telephone client contact 62.5 percent of their shift. Plaintiff asserts that she was required to spend twenty (20) more hours of telephone work per month, for a total of 300 more hours, than employees on the earlier shift.

2) The VA subjected plaintiff to discrimination based upon her "disability"[15] in that the VA:

A) failed to acknowledge plaintiff's disability on November 4, 2004;
B) failed to accommodate the plaintiff's disability by refusing to allow her to
   work part-time;
C) failed to accommodate the plaintiff's disability by searching for available
   positions for reassignment and/or to inform her of two (2) vacancies;
D) failed to qualify plaintiff for an interview for a Senior Claims Examiner
   position for which she applied and refused to reassign plaintiff to that position
   when two (2) other employees in plaintiff's unit were reassigned;
E) refused to allow plaintiff to work overtime on January 15, 2005;
F) failed to implement the VA's approved accommodation for her disability by
   allowing her to get up from her desk once an hour;
G) refused to accept plaintiff's medical documentation as proof of disability
   and need for accommodation;
H) charged plaintiff with being absent without leave (AWOL) instead of approving

_____

[14]Plaintiff attempted once before to modify her claims when in January 2007 she filed an amended complaint. Document #8, filed January 8, 2007. However, this Court dismissed plaintiff's ADA claims as well as certain-named defendants. Court Order #24, filed April 6, 2007. Plaintiff did not seek to amend her complaint after April 6, 2007.

[15]Nowhere in the plaintiff's complaint or amended complaint does she identify her "disability"; however, upon careful review of all pleadings filed in this cause of action, including all exhibits filed in connection with the instant summary judgment motion, the Court presumes (for purposes of the matter presently before it) that the plaintiff's "disabilities" are dwarfism and spinal stenosis.

her sick leave and annual leave requests; and

I) refused to allow plaintiff to view time cards showing her AWOL charges.

3) Plaintiff's additional disability claims are related to alleged instances unrelated to her tardiness and promotion claims:

   A) Plaintiff's supervisors threatened to have plaintiff's van towed from a handicapped parking space in the parking lot, and then charged plaintiff with insubordination for failing to move her car from the handicapped parking space; and

   B) VA subjected the plaintiff to further disability discrimination when she was removed from employment and forced to apply for disability retirement.

4) Plaintiff was subjected to disparate treatment and harassment based on her disability because the VA granted three (3) other employees' Family Friendly sick leave requests, while denying the plaintiff's Family Friendly sick leave requests.

5) VA employees[16] retaliated against the plaintiff by:

   A) charging her with AWOL on April 19, April 22, May 24, July 23, July 28, October 1, October 8, and November 12, 2004 (and other unspecified dates);

   B) charging plaintiff with AWOL for time spent preparing EEO testimony;

   C) charging plaintiff with AWOL for performance of her union duties;

   D) issuing incorrect telephone agent activity log reports to her;

   E) meeting with the plaintiff's union steward without authorization from plaintiff or notice to her;

   F) attempting to deny plaintiff eight (8) hours of time to respond to her proposed removal;

   G) attempting to have plaintiff sign a letter of alternative discipline in order to avoid a three (3)-day suspension without pay; and

   H) suspending plaintiff for fourteen (14) days.

6) The VA subjected plaintiff to a hostile work environment by:

   A) issuing plaintiff a written counseling for plaintiff's use of approved leave;

   B) calling plaintiff to over twenty (20) meetings in October 2004, preventing her from performing her job;

   C) charging plaintiff with AWOL for arriving less than seven (7) minutes late to work or on-time to work;

---

[16]The Court presumes that these "employees" are the plaintiff's supervisors and/or other management personnel.

D) disciplining plaintiff regarding her absences which led to her removal from
   employment;
E) refusing to remove records of disciplinary actions from plaintiff's personnel
   file;
F) denying requested sick leave or annual leave when plaintiff provided medical
   documentation;
G) intimidating plaintiff by revoking a previously approved change in core time;
H) subjecting plaintiff to intolerable working conditions prompting her request
   to be reassigned; and
I) refusing to reassign plaintiff and urging her to apply for disability retirement.

Summarily, plaintiff contends that the Merit Service Protection Board's (MSPB) decision to uphold plaintiff's removal from employment was improper because it was not based on substantial evidence. She further contends that the VA refused to accommodate her alleged disabilities, in violation of federal law. She further contends that she was terminated from her employment due to her alleged disabilities, in violation of federal law. Finally, she contends that she was subjected to harassment on the job due to her alleged disabilities, in violation of federal law.

**Judicial Review of "Mixed Case" Discrimination Complaints**

The MSPB determined that the decision to remove the plaintiff from her employment was proper due to the plaintiff's excessive tardiness and her threat of physical harm to a supervisor (disrespectful conduct). Plaintiff disputes arguing that this decision was improper because it is not based on substantial evidence to support such a decision. Defendant argues that the administrative record clearly shows substantial evidence supporting the MSPB's final decision upholding plaintiff's termination from employment.

Federal law provides for judicial review of the MSPB's final decision; 5 U.S.C. §7703(a)(1) provides, in pertinent part:

> "Any employee or applicant for employment adversely affected
> or aggrieved by a final order or decision of the Merit Systems
> Protection Board may obtain judicial review of the order or decision."

When the MSPB decides a case involving both discrimination and non-discrimination claims (such as the present case), the district court has jurisdiction over the appeal from both types of claims. Mason v. Frank, 32 F.3d. 315, 317 (8th Cir. 1994); *see also*, Buck v. Internal Revenue Service, 2007 WL 2994445 (E.D.Mo. Webber, J.) *aff'd* 324 Fed.Appx. 540, 2009 WL 1311665 (8th Cir. 2009) *cert. denied* 2009 WL 3316343.[17]  In a mixed case review, "the adverse agency action is reviewed on the administrative record, while the discrimination claim is reviewed *de novo*."  Crawford v. Runyon, 37 F.3d. 1338, 1340 (8th Cir. 1994); Mason v. Frank, at 317; Buck v. IRS, 2007 WL 299445, *3; *see* 5 U.S.C. §7703(c).

The scope of judicial review with respect to the non-discrimination claims in a mixed case is very narrow and limited specifically to review of the administrative record.  Pursuant to §7703(c)(1)-(3), the district court shall review the record and hold unlawful and set aside any agency action, findings, or conclusions the court finds to be: 1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; 2) obtained without procedures required by law, rule or regulation having been followed; or 3) unsupported by substantial evidence .  Crawford, at 1340-41; Mason, at 317-18; Buck v. IRS, *supra*.  "Judicial review of MSPB decisions is narrow in scope.  We will affirm rational decisions to dismiss federal employees if applicable procedures were followed and substantial evidence supports the MSPB's determination."  Buck v. IRS, *supra* (*quoting* Jones v. Farm Credit Administration, 702 F.2d. 160, 162 (8th cir. 1983)).

The Supreme Court has held that substantial evidence is "more than mere scintilla.  It means such relevant evidence as a reasonable mind might accept to support a conclusion."

[17]In those instances wherein an unpublished district court or appellate decision has provided significant guidance to the Court, such decision will be cited.

Consolidated Edison Co. v. NLRB, 305 U.S. 197-229 (1938); NLRB v. La-Z-Boy Midwest, 390 F.3d. 1054, 1058 (8th Cir. 2004) *quoting* Consol. Edison Co. v. NLRB, *supra.* "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Ratliff v. Jefferson Pilot Financial Ins. Co., 489 F.3d. 343, 346 (8th Cir. 2007); *see also*, King v. Hartford Life & Accident Ins. Co., 414 F.3d. 994, 999 (8th Cir. 2005) *citing* Donaho v. FMC Corp., 74 F.3d. 894, 900 n.10 (8th cir. 1996)(internal citations omitted). "Substantial evidence exists when `a reasonable mind might accept' a particular evidentiary record as `adequate to support a conclusion.'" Wal-Mart Stores, Inc. v. NLRB, 400 f.3d. 1093, 1097 (8th Cir. 2005) *citing* Consol. Edison Co. v. NLRB, *supra.* Although substantial evidence is more than a mere scintilla, it is less than a preponderance. Ratliff, at 346 (internal citations omitted). Substantial evidence standard is deferential to the fact-finder.[18] Credibility determinations are normally within the discretion of the ALJ hearing the case. Crawford, at 1341 *citing* Griessenauer v. Department of Energy, 754 F.2d. 361, 364 (Fed.Cir. 1985). Finally, the plaintiff (appellant) has the burden of proof, by a preponderance of the evidence[19], regarding any affirmative defenses. 5 C.F.R. §1201.56(a)(2)(iii)(2005).

---

[18]The federal regulations applicable to reviews of MSPB decisions defines "substantial evidence" as follows:

> **Substantial evidence**. The degree of relevant evidence that a reasonable person, considering the record as a whole, might accept as adequate to support a conclusion, even though other reasonable persons might disagree. This is a lower standard of proof than preponderance of the evidence.

5 C.F.R. §1201.56(c)(1)(2005).

[19]The federal regulations applicable to reviews of MSPB decisions defines "preponderance of the evidence" as follows:

> **Preponderance of the evidence.** The degree of relevant evidence that a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely to be true than untrue.

5 C.F.R. §1201.56(c)(2)(2005).

## MSPB's Decision re Excessive Tardiness

Using the standards articulated above, the Court finds that there was substantial evidence supporting the MSPB's decision. Plaintiff's immediate supervisor, Scott Nordmoe, repeatedly observed tardiness problems with plaintiff. Nordmoe repeatedly counseled plaintiff as to her repeated tardiness but she continued to come to work late with a variety of excuses, the majority of which had no causal connection to her alleged disabilities. The ALJ reviewed thoroughly each of the sixteen (16) instances of tardiness between October 15 and December 15, 2004 and found substantial evidence to support the charge of tardiness and/or AWOL. The administrative record before the Court shows the following:

> 1) October 15, 2004 - plaintiff was tardy because she attended a meeting at her stepson's school to sign paperwork despite the child's father availability to sign the paperwork (which he apparently did);
> 2) October 19, 2004 - plaintiff was tardy due to a "headache" which she failed to document per her imposed leave restrictions - the physician's statement of January 18, 2005 failed to specifically address this instance;
> 3) October 21, 2004 - plaintiff was tardy because she had to attend to "personal business" regarding her residential telephone service;
> 4) October 25, 2004 - plaintiff was tardy because her alarm clock did not work due to an alleged power outage which she failed to document despite Nordmoe's request to do so;
> 5) October 26, 2004 - plaintiff was tardy because of flooding in her home;
> 6) October 27, 2004 - plaintiff was tardy because she was "too tired and exhausted to drive" allegedly due to the water in her home;
> 7) October 28, 2004 - plaintiff was late to work because she forgot to pick up her food while going through a McDonald's drive-through and had to return to get it;
> 8) October 29, 2004 - plaintiff was late to work because of an alleged motor vehicle accident in which she failed to document despite Nordmoe's request;
> 9) December 3, 2004 - plaintiff was tardy because there was a "bi-state bus incident" in which "ambulances were involved" that did not involve her motor vehicle;
> 10) December 6, 2004 - plaintiff was late to work because she "lost track of time" while preparing her response "evidence for EEO testimony";
> 11) December 7, 2004 - plaintiff was late to work but claims that she was only 6-7 minutes late as opposed to 15 minutes as noted by Nordmoe;
> 12) December 8, 2004 - plaintiff was tardy because she was again preparing for EEO testimony but failed to provide Nordmoe with any

advance notice of EEO activities;

13) December 10, 2004 - plaintiff was tardy because she "was too tired to drive safely" but failed to document any medical reason for her "tiredness";

14) December 13, 2004 - plaintiff was late to work but only contested the amount of time she was late;

15) December 14, 2004 - plaintiff was late to work because of "heavy traffic";

16) December 15, 2004 - plaintiff was late to work but only contested the amount of time she was late.

The ALJ found substantial evidence documenting a long history of tardiness predating the subject time-period which gave rise to plaintiff being repeatedly counseled by management as to the need for her to report to work on time.[20] The ALJ found the denials of plaintiff's repeated requests for annual leave and/or sick leave to be reasonable under the circumstances of plaintiff's apparent inability to arrive to work on time. Plaintiff was given numerous chances to improve her attendance record but failed to do so.

As for the attendance issue, plaintiff continually argued that because she "was at work every day", her leave requests should have been honored. However, the administrative record

_____

[20]The Agency reviewed approximately thirty-two alleged instances of alleged age, disability, and retaliation discrimination dating back to April 2004 pursuant to the plaintiff's amended mixed EEO complaint. Gov. Exhibit D. The Court's review of the Agency's FAD shows that substantial evidence existed to support each of the disciplinary actions taken, and that the Agency correctly interpreted and applied the applicable law. As for plaintiff's removal from employment, the Agency found that plaintiff had been repeatedly counseled, admonished, reprimanded, and suspended twice but her tardiness behavior did not change. The Agency found no discriminatory animus with regard to the "cone in her parking space" incident, the denial of a promotion, her suspension for threatening Nordmoe, or her ultimate removal from employment. The MSPB reviewed specifically the sixteen (16) instances of disciplinary action as charged in the removal proposal and the instance of disrespectful conduct as charged in the removal petition; however, the MSPB also reviewed the plaintiff's excessive past disciplinary history, including all the instances as she had pled in her amended EEO complaint. The Court's present administrative review is primarily focused on the instances as charged in the removal proposal; however, the Court has reviewed the entire administrative record regarding all of plaintiff's alleged instances of wrongful disciplinary action by the VA and still concludes that substantial evidence exists supporting all disciplinary actions taken by the VA regarding plaintiff's tardiness.

clearly shows that the problem was plaintiff's history of excessive tardiness and failure to comply with the conditions set by her leave restrictions. The Court concurs with the ALJ's decision that all sixteen (16) instances as charged were supported by preponderant evidence. The ALJ's decision was based on substantial evidence and was not arbitrary, capricious, or an abuse of discretion; therefore, the MSPB's decision is upheld and defendant is entitled to summary judgment on this claim.

### MSPB's Decision re Disrespectful Conduct and Disruption of the Workplace

As to the charge of disrespectful conduct and disruption of the workplace, the Court finds that substantial evidence exists in the administrative record to support this determination. Plaintiff contends that there was no evidence that she ever threatened to physically harm Nordmoe. A review of the record before the MSPB shows there was substantial evidence that, if credited, supported the ALJ's conclusion that plaintiff had threatened to harm or kill Nordmoe and was unfit for duty. *See*, Crawford v. Runyon, at 1341. The ALJ found two (2) witnesses[21] statements regarding the plaintiff's subject comments to be credible, having found nothing in their testimony to indicate any motive to perjure themselves. The ALJ further found that Bragg's investigation and testimony supported the witnesses' testimony.

Plaintiff contends that she never specifically referred to Nordmoe, even assuming the comment was made. The ALJ found that Ms. Brown and Ms. Clark's testimony clearly showed that plaintiff was angry with Nordmoe and was referring to him when she made the threatening remarks. Plaintiff further contends that assuming the comment was made, she only wanted to go to Nordmoe's home to talk to him about her leave situation. The ALJ found plaintiff's testimony to lack credibility because of the adversary relationship between plaintiff and Nordmoe, that it

---

[21]Bertha Brown and Gloria Clark.

was "extremely unlikely that any federal manager would agree to allow an angry employee to follow him home for government business relating to a `leave situation'", and that plaintiff had plenty of opportunities to discuss her leave situation with Nordmoe while at work. Gov. Exhibit E, pg. 12. As stated before, credibility determinations are normally within the discretion of the ALJ who hears the case. Crawford v. Runyon, at 1341. The administrative record substantially supports the ALJ's findings, and the ALJ's decision was not arbitrary, capricious, or an abuse of discretion. The MSPB's decision is upheld, and the defendant is entitled to summary judgment on this claim.

### MSPB's Decision re Removal

The MSPB's decision upholding the plaintiff's removal as a penalty for excessive tardiness and poor workplace behavior (threat of physical harm to a supervisor) is supported by substantial evidence in the administrative record.

On December 22, 2004 plaintiff was notified, in writing, of the removal proposal. She was given notice of excessive unexcused tardiness (for the period of October 15, 2004 through December 15, 2004) and for disrespectful conduct and disruption of the workplace. Gov. Exhibit X. The ALJ not only reviewed in depth the stated sixteen (16) instances of tardiness set forth in the removal proposal, but also plaintiff's "extensive past disciplinary history" including, but not limited to, 1) an admonishment issued May 18, 2004; 2) a reprimand issued July 7, 2004; 3) a three-day suspension issued September 8, 2004; 4) a fourteen-day suspension issued November 10, 2004; and an admonishment issued November 16, 2004.

The ALJ further found Mr. Unterwagner's testimony credible and supportive of the VA's removal of plaintiff. Unterwagner testified that plaintiff's chronic tardiness and lack of dependability undermined the VA's mission of providing reliable customer service to clients.

Unterwagner further testified that he was extremely bothered by plaintiff's comments regarding a physical threat of harm to Nordmoe.  He noted that plaintiff had been previously disciplined for disrespectful conduct towards Ms. Wright, and this instance of disrespectful conduct was an escalation because plaintiff was in direct daily contact with Nordmoe.  Finally, Unterwagner testified that he considered plaintiff to have no rehabilitative potential because despite numerous counseling, admonishments, and suspensions, she was unwilling to change her behavior.  He testified that her actions were "highly notorious" and "unprecedented within the workplace".  The evidence before the ALJ showed that "there is no similarly-situated employee with whom the appellant **[Plaintiff]** can be compared."  Gov. Exhibit E, pg. 19.  Finally, the evidence before the ALJ showed no mitigating circumstances and no possible alternative disciplinary sanction.  The MSPB's decision is upheld and the defendant is entitled to summary judgment on this claim.

### Plaintiff's Discrimination Claims - Age Discrimination

As stated before, the plaintiff's discrimination claims are subject to a *de novo* review by this Court.  Plaintiff's discrimination claims are 1) disparate impact age discrimination;[22] 2) disparate treatment disability discrimination; 3) disparate treatment disability discrimination - failure to accommodate; 4) retaliation; and 5) hostile work environment (presumably based on disability).

---

[22]Although it appears that plaintiff may have been arguing a disparate treatment age claim throughout her administrative appeals, her amended response to the defendant's summary judgment only advances a disparate impact age discrimination claim.  However, even if plaintiff were still attempting to argue a disparate treatment claim based on age, it would fail for the simple fact that plaintiff has failed to provide any evidence that management was aware of her age at the time of her disciplinary actions; *see*, Gov. Exhibit N-1, pgs. 20-21 and Gov. Exhibit O, pg. 28.  She has also failed to provide any evidence of similarly-situated employees (excessive chronic tardiness and making a threat of physical harm to a supervisor) who were not subject to the same types of disciplinary action on the basis of age. *See*, Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 142 (2000); Thomas v. Corwin, 483 F.3d. 516, 528 (8th Cir. 2007).

To establish a *prima facie* case of disparate impact under the ADEA, the plaintiff must identify a specific employment practice and then present statistical evidence of a kind and degree sufficient to show that the practice in question caused the plaintiff to suffer an adverse employment action because of his/her age. Equal Employment Opportunity Commission v. Allstate Ins. Co., 528 F.3d. 1042, 1049 (8th Cir. 2008); Evers v. Alliant Techsystems, Inc., 241 F.3d. 948, 953-54 (8th Cir. 2001). A plaintiff falls short by merely alleging a disparate impact, or "point[ing] to a generalized policy that leads to such an impact. Meacham, et.al. v. Knolls Atomic Power Laboratory, aka KAPL, Inc., - U.S. -, 128 S.Ct. 2395, 2405 (2008) *quoting* Smith v. City of Jackson, Mississippi, 544 U.S. 228, 241 (2005). The plaintiff must isolate and identify the **specific** employment practice(s) that are allegedly responsible for the asserted statistical disparities. Meacham v. Knolls Atomic Power Laboratory, 128 S.Ct. at 2405-06; City of Jackson, 544 U.S. at 241 (emphasis added). The reason for the requirement to isolate and identify a specific employment policy or practice is to avoid the "result [of] employers being potentially liable for `the myriad of innocent causes that may lead to statistical imbalances.'" Meacham v. Knolls Atomic Power Laboratory, 128 S.Ct. at 2406 *quoting* City of Jackson, 544 U.S. at 241 (*citing* Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 657 (1989)). Identifying a specific practice is "not a trivial burden". Meacham, 128 S.Ct. at 2406.

In the present case, plaintiff contends that the persons working the "late shift" (the shift she was working during the relevant time-period) were required to work more hours on the phones than employees on the earlier work shift, and that the majority of the late shift workers were over the age of 40. Plaintiff contends that she was "forced" to work the late shift because she did not request to work the late shift, and another employee was ruled ineligible for promotion because he could not work the late shift. Defendant VA contends that employees

were allowed to choose their work schedules, and that plaintiff did request to work the late shift. Defendant further contends that all employees on the Education Customer Service team had the same amount of telephone claim work requirement during their shift; i.e. 5.5 hrs. each 8-hr work shift.

Plaintiff's claim for disparate impact age discrimination fails for a number of reasons. Firstly, she has failed to identify a particular policy of the VA which requires persons to specifically work the late shift, and she fails to dispute that Nordmoe allowed employees to choose their shift. Secondly, plaintiff testified that she chose the late shift to accommodate her disability. Gov. Exhibit J, pg. 40. Moreover, she cites statistics purportedly pertaining to disparate impact but fails to provide any objective evidence supporting her statistics; e.g. she fails to identify the workers on the late shift over the age of 40. Finally, plaintiff has offered no objective evidence to support her contention that employees on the late shift had to work more hours of telephone client work than employees on the earlier shift. She fails to dispute the evidence establishing that the requirement of 5.5 hrs of telephone work during an 8-hr workday was the VA national performance standard  Plaintiff has failed to set forth a viable disparate impact age discrimination claim.

### Disability Discrimination - Disparate Treatment

Section 504 of the Rehabilitation Act of 1973 states in pertinent part:

> No otherwise qualified individual with handicaps in the
> United States, as defined in section 7(8) [29 U.S.C. §706(8)],
> shall, solely by reason of her or his handicap, be excluded
> from the participation in, be denied the benefits of, or be
> subjected to discrimination under any program or activity
> receiving Federal financial assistance or under any program
>  or activity conducted by any Executive agency or by the
> United States Postal Service.

29 U.S.C. §794(a). Rehabilitation Act cases are subject to the burden-shifting analysis of McDonald Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973).[23] Crawford v. Runyon, at 1341. Plaintiff has the initial burden to establish a *prima facie* case of disability discrimination. If plaintiff succeeds in establishing the *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action(s). Once the defendant articulates such a reason, the burden shifts back to the plaintiff to show that the defendant's stated reason(s) is merely a pretext for discrimination. Crawford v. Runyon, at 1341 *citing* McDonald Douglas, *supra.*

To establish a *prima facie* case of disability discrimination, a plaintiff must show: 1) that s/he is disabled under the meaning of the Act; 2) s/he is qualified to do the essential job functions; and 3) s/he suffered an adverse employment action due to his/her disability. Buboltz v. Residential Advantages, Inc., 523 F.3d. 864, 868 (8th cir. 2008); *see,* Berkey v. Henderson, 120 F.Supp. 2d. 1189, 1191 (S.D.Iowa 2000); Gage v. Potter, 2009 WL 5220159, *3 (E.D.Mo. December 31, 2009).

Before addressing the merits of the plaintiff's disparate treatment claim based on her "disability", the Court must first address the issue of the plaintiff's "disability". Firstly, the record is unclear as to exactly the nature of the plaintiff's claimed "disability". She repeatedly states that "the EEO has ruled the Plaintiff is a `qualified individual with a disability". She also appears to argue that by virtue of both Illinois and Missouri providing her with a handicapped parking plaque for her van, this is definitive proof of her disabled status. Finally,

---

[23]As will be addressed later in this opinion, disability discrimination treatment claims are subject to the McDonnell-Douglas burden-shifting analysis; however, disability discrimination-failure to accommodate claims are not subject to the McDonnell-Douglas burden-shifting analysis. Peebles. v. Potter, 354 F.3d. 761, 766-768 (8th Cir. 2004).

she appears to assume that because in past years the VA has made certain "Accommodations" for her (allowing her to have a scooter and modifying her desk), this also is definitive proof of her disabled status.

Whether or not plaintiff is disabled must be considered in the context of the present action; not whether she had been considered or viewed as disabled in past years outside the context of the current cause of action. In the present case, the EEO did not "rule" that she was a "qualified individual with a disability". In fact, the EEO stated "[F]or purposes of analysis, we **assume** petitioner is an individual with a disability. Gov. Exhibit G (emphasis added). At the time of the EEO's review of the MSPB's Final Order, the EEO listed plaintiff's disability as spinal stenosis, congenital dwarfism, and vertigo. Gov. Exhibit G. Furthermore, whether plaintiff is considered "disabled" must be within the context of the Rehabilitation Act. 29 U.S.C. §705(20)B). It is of little weight to this Court's consideration that state agencies consider plaintiff "disabled" for purposes of parking a motor vehicle. Finally, what factors influenced the VA to allow plaintiff to use a scooter or modify her desk are not before this Court with regard to the current litigation.

Like the EEO, and since the Court can discern no dispute on this point, the Court will assume, for purposes of analysis, that the plaintiff is disabled within the meaning of the Rehabilitation Act. *See*, Dexler v. Tisch, 660 F.Supp. 1418 (D.Conn. 1987)(The Government stipulated that plaintiff with achondroplastic dwarfism was a handicapped person within the meaning of the Rehabilitation Act.).

Plaintiff claims that she was subjected to discriminatory treatment on the basis of her disability because: 1) the VA failed to acknowledge her disability on November 4, 2004[24]; 2) refused to allow plaintiff to work overtime on January 15, 2005; and 3) refused to allow the plaintiff to view her time cards showing her AWOL charges. The undisputed evidence is that none of these claims were ever asserted by the plaintiff in the administrative process. These claims are not included in the VA's FAD, which meticulously reviewed the plaintiff's EEO complaint and all her subsequent amendments to same. A plaintiff must first assert all claims and exhaust administrative remedies to those claims before asserting them in a district court pursuant to the Rehabilitation Act. 29 U.S.C. §794a(a); Morgan v. USPS, 798 F.2d 1162, 1165 (8th Cir. 1986); see, Rice v. Snow, 2006 WL 931922, *23 (W.D.Mo. April 11, 2006). Thus, these claims are summarily denied for failure to exhaust administrative remedies.

Next, plaintiff contends that she was subject to disability discrimination treatment because she was not selected to interview for Senior Claims Examiner position for which she applied and was qualified; and two (2) other employees in her unit were reassigned to this position. She contends that she was not selected to interview because of her disciplinary record (which she primarily blames on Nordmoe) and that Nordmoe was on the promotions team and did not want to give her the promotion.

It is undisputed that plaintiff was found to be "qualified"; however, she did not rank high enough to merit an interview. Assuming that plaintiff has established a *prima facie* case on this claim, she has not established that the VA's reason(s) for denying her the promotion was a

---

[24]It is unclear exactly what is the nature of this claim. In her amended complaint before this Court it appears that she contends she had a meeting with Mr. Bragg in which she requested a part-time schedule and that Bragg denied her request because "he didn't believe I had a disability".

pretext for disability discrimination. The names on the applications were removed before being reviewed by the members of the promotion panel. Nordmoe was only one of several members of this panel reviewing the blind applications. Adam Giraudo, as the VA Human Resources Specialist, facilitated the promotion panel and processed the applications. Each applicant was assigned a numeric score based upon answers to a series of questions on the application. There is no evidence that the questions on plaintiff's application were any different from the questions on the other applicants' forms. After the panel members scored the applications, the VA Human Resources personnel tallied the applicants' scores[25], ranked the applicants accordingly, and decided how many applicants were qualified to be interviewed for the position. The VA Human Resources department made the determination as to who would be referred for selection. Plaintiff qualified but did not have a high enough scored to meet the requirement to be interviewed. Gov. Exhibit P-3, pgs. 18-29. Plaintiff has not provided any evidence that this protocol was not followed or that anyone in the application review process rejected her for selection for an interview based upon her disability.

Plaintiff has not provided any evidence that other employees were selected for an interview or promoted to the Senior Claims Examiner position with scores lower than her score. She continuously argues that Nordmoe rated the plaintiff with a "0" "on at least one element on the Supervisor's part of the interview process." Plaintiff's Amended Response, pg. 12.[26]. Plaintiff has not produced any evidence that Nordmoe did indeed score her with a "0" on at least

---

[25]Giraudo was aware of the names on the applications, but he had no involvement with the scoring of the applicants' responses. He only tallied the scores based upon the panel members' blind review and scoring of the applications.

[26]Plaintiff's amended response does not have the pages numbered but it appears that this statement is on page 12 of Document #61.

one element of the application.[27] Furthermore, plaintiff has not provided any evidence that even if plaintiff received a "0" on a part of her application that either Nordmoe was the panel member who gave her this score or that Nordmoe knew it was plaintiff's application when he allegedly gave her this score. This claim fails.

Next, plaintiff contends that she was charged with being AWOL instead of having her sick leave and annual leave requests approved, and that such charges were discriminatory. Firstly, the Court has reviewed all of the disputed dates and it appears that there are two (2) contentions: 1) at least two of her leave requests were related to her disability and should have been approved; and 2) her Family-Friendly sick leave requests were denied when other employees had their requests approved for similar reasons.

Plaintiff contends that two (2) of her leave requests, on April 22 and April 26, 2004, should have been approved because they were related to her disability. Plaintiff failed to provide any medical documentation, as properly requested, to support her contention that her tardiness was in fact related to any one of her claimed disabilities. Furthermore, at the time of these two charges, plaintiff had been counseled and clearly forewarned about her continuing tardiness and given leave restrictions. Plaintiff was charged with AWOL on these two occasions because of her extensive history of tardiness and her failure to comply with the leave restrictions imposed on her.[28] Plaintiff has offered no evidence to demonstrate that this was a pretext for disability discrimination.

---

[27]Plaintiff has filed with the Court, in support of her amended response, hundreds of pages of "exhibits"; however, she rarely refers to any specific exhibit in support of her allegations. It is not the Court's duty nor obligation to sift through voluminous amounts of documents to locate plaintiff's supporting evidence.

[28]However, on May 5, 2004, plaintiff was late to work due to a doctor's appointment and requested unscheduled sick leave. This request was granted by Nordmoe. Gov. Exhibit H.

Plaintiff claims that the denial of her Family-Friendly sick leave requests were discriminatory because other employees with similar requests had them approved. Plaintiff had Family -Friendly sick leave requests for April 27, April 28, May 7, May 13, May 14, May 17, May 18, May 19, May 20, May 21, and May 26, 2004; all of these requests were approved by Nordmoe.

Plaintiff, however, contends that she was wrongfully denied Family-Friendly sick leave requests on April 19 and April 20, 2004. On these dates, plaintiff arrived late and failed to comply with her leave restrictions as regards supporting her Family-Friendly sick leave requests. Plaintiff further appears to contend that three (3) other employees were granted Family-Friendly sick leave requests "similar" to her requests. The evidence before the Court indicates that these other employees were granted such leave requests to attend to matters relating to their respective mothers' deaths. Plaintiff had requested leave to attend to matters related to **her fiance's mother**. Plaintiff's requests had nothing to do with her disability; and furthermore, contrary to her convoluted arguments, had nothing to do with her immediate family; i.e. her mother. Plaintiff has failed to provide any evidence that the VA's denial of her sick leave or Family-Friendly sick leave requests were a pretext for disability discrimination.

The same review is applicable to plaintiff's claim that she was wrongfully denied Family-Friendly sick leave on May 7, 2004. On this date, plaintiff contends she should have been given said leave because she "had to meet with [her] fiance's mother's therapist." Gov. Exhibit I, pg. 78. Plaintiff's leave had no connection whatsoever with her alleged disabilities, and she could have submitted a sick leave request in advance but she did not follow the protocol set in place. Nordmoe denied her unscheduled leave request and charged her with AWOL because of her history of excessive tardiness.

Finally, plaintiff contends that the disciplinary action taken against her for refusing a direct order (from her supervisors) to move her car on April 13, 2004 was disability discrimination. Plaintiff contends that the VA had "ulterior motives" because ultimately she only had to back her van partly out of the parking space, not move her van to a completely different non-handicapped parking space. The evidence before the Court shows that the building's owner/management requested that plaintiff move her car, and that plaintiff's supervisors were the conduit for this request. The evidence also shows that plaintiff, once again, was late to work, and the other space was already occupied. The evidence also shows that plaintiff had the option to move her van to the parking shed (with handicapped parking spaces) adjacent to plaintiff's building. The evidence also shows that despite three (3) direct verbal orders from three (3) different supervisors, plaintiff continuously argued and demanded some type of proof in writing of the need to move her van. There is no evidence provided by plaintiff that her supervisors had to make their requests in writing to her. Furthermore, the fact that plaintiff's contentiousness in this matter ultimately lead Balke (the building owner/management) to agree to have plaintiff back her van out part way so that the repair work could be done is immaterial to her discrimination claim. There is no evidence that the VA's repeated requests for plaintiff to move her van was based on her disability, and there is no evidence that the reprimand given to her for disobeying three (3) direct orders from three (3) different supervisors was based on disability discrimination. Plaintiff's claim fails.

### Disability Discrimination - Failure to Accommodate

Plaintiff contends that the defendant failed to accommodate the plaintiff's disability by refusing to allow her to work part-time, by failing to search for other available positions to which she could be assigned and failing to make her aware of two (2) open positions, by failing to

implement the VA's approved accommodation of allowing plaintiff to stand by her desk once per hour; and by refusing to accept plaintiff's medical documentation as proof of disability and need of accommodation.

A claim of failure to accommodate in the context of an employment action is a "separate form of prohibited discrimination". Peebles v. Potter, 354 F.3d. 761, 766 (8th Cir. 2004). "Under the Act and its regulations, such discrimination occurs if `a covered entity [does] not . . . make reasonable accommodation to the known physical or mental limitations of an otherwise qualified applicant or employee with a disability, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of its business." Peeples v. Potter, at 766 (citations omitted).

Reasonable accommodation claims are not evaluated under the McDonnell-Douglas burden-shifting analysis, but rather "a modified burden-shifting analysis" is applied. Peebles v. Potter, at 766; see also, Mershon v. St. Louis University, et. al., 442 F.3d. 1069, 1074 (8th Cir. 2006) citing Peebles v. Potter, supra.[29]; Hoag v. Arkansas State Highway & Transportation Dept., et. al., 177 Fed.Appx. 521, 522 (8th Cir. 2006). A modified- burden shifting analysis is utilized because "a claim against an employer for failing to reasonably accommodate a disabled employee does not turn on the employer's intent or actual motive". Peeples v. Potter, at 766. Specifically,

> "In a reasonable accommodation case, the `discrimination' is framed in terms of the failure to fulfill an affirmative duty- the failure to reasonably accommodate the disabled individual's limitations. The Act compels employers to modify their work requirements to enable disabled individuals to have the same opportunities as their non-disabled counterparts. The concern is compelling behavior, not policing an

---

[29]Legal principles involved in reviewing Americans with Disabilities (ADA) claims are equally applicable to claims under the Rehabilitation Act. Mershon, at 1074, n.3.

employer's actions that, when accompanied by an invidious discriminatory intent, are unlawful. As such, it is not the employer's discriminatory intent in taking adverse employment action against a disabled individual that matters. Rather, discrimination occurs when the employer fails to abide by a legally imposed duty. The known disability triggers the duty to reasonably accommodate and, if the employer fails to fulfill that duty, we do not care if he was motivated by the disability."

Peeples v. Potter, at 767.

Under this modified-burden shifting analysis, the plaintiff still must first establish a *prima facie* case by showing that s/he is disabled; that s/he is qualified to perform the essential functions of the job with or without reasonable accommodation; and that s/he suffered an adverse employment action due to the disability. Buboltz, *supra.*; Barnes v. City of Coon Rapids, Minnesota, 2009 WL 1178555, *2 (D.Minn. April 30, 2009). Furthermore, if the plaintiff believes s/he is "otherwise qualified" with a reasonable accommodation, it is the plaintiff's burden to request such an accommodation. If an employee fails to make a request for accommodation, then the employer has no duty to accommodate. Buboltz, at 870 *citing* Ballard v. Rubin, 284 F.3d. 957, 960 (8th Cir. 2002).

Employees and employers have a shared responsibility in resolving accommodation requests. Not only must the employee initiate the accommodation process by making the employer aware of the need for an accommodation, *see*, Peyton v. Fred's Stores of Arkansas, 561 F.3d. 900, 903 (8th Cir. 2009), but the employee must also provide relevant details of his/her disability and the reasons that the disability requires the requested accommodation. EEOC v. Convergys Customer Management Gp., 491 F.3d. 790, 795 (8th Cir. 2007); *see also*, Taylor v. Union Pacific Railroad, 2008 WL 4057128, *3 (E.D.Ark. August 27, 2008)(plaintiff failed to show that requested transfer was to accommodate his alcoholism). Finally, the plaintiff employee must make a facial showing that the requested accommodation is "reasonable".

Peebles v. Potter, at 768.  If the plaintiff does request an accommodation, the employer must

engage in an interactive process to evaluate whether reasonable accommodations are possible.

Peyton, at 902;  Buboltz, at 870; EEOC v. Convergys Customer Management Gp., at 795.

Failure to engage is an interactive process regarding the requested accommodation is *prima facie*

evidence of the employer's bad faith.  Buboltz, at 870.  Employers may demonstrate a good faith

attempt to find a reasonable accommodation for a disabled employee by "first analyz[ing] the

relevant job and the specific limitations imposed by the disability and then, in consultation with

the individual, identify potential effective accommodations."  EEOC v. Convergys Customer

Management Gp., at 795 *quoting* Cannice v. Norwest Bank Iowa N.A., 189 F.3d. 723, 726 (8th

Cir. 1999); *see also*, Fjellestad v. Pizza Hut of America, Inc., 188 F.3d. 944, 954 (8th Cir. 1999).

The employee must also work with the employer in good faith to help determine what

accommodation is necessary.  Cannice, at 727 *citing* Fjellestad, at 616-19.  Finally, if such

accommodations are possible, then the employer must reasonably accommodate the employee's

request; however, the employer need not provide the exact accommodation requested.  Buboltz,

at 870.

The Court must first address the plaintiff's repeated contentions regarding her disability

status and that the VA cannot make a case proving she was not at work on a regular basis.

Plaintiff's disability status is not an issue in this case; the issue is whether there is a causal

connection between her disability and the VA's adverse employment action.  Furthermore,

whether or not plaintiff was "regularly at work" is also irrelevant.  Plaintiff was ultimately

terminated from her employment due to a long history of chronic, unexcused tardiness and for

plaintiff's misconduct (her statements regarding physical threat of harm to Nordmoe).

After review of the complete evidentiary record before this Court, the Court determines that plaintiff has failed to make a *prima facie* case for disability discrimination for failure to provide a reasonable accommodation for a number of reasons.

Plaintiff is unable to establish a *prima facie* case because she cannot show that she is qualified to perform the essential functions of her job, with or without reasonable accommodation. Plaintiff's chronic tardiness renders her unable to fulfill the essential function of regular and reliable attendance. Attendance at work is a necessary job function. Epps v. City of Pine Lawn, 353 F.3d. 588, 593 n.5 (8th Cir. 2003) *citing* Nesser v. Trans World Airlines, Inc., 160 F.3d. 442, 445 (8th Cir. 1998); Spangler v. Federal Home Loan Bank of Des Moines, 278 F.3d. 847, 850 (8th Cir. 2002) *citng* Pickens v. Soo Line R.R. Co., 264 F.3d. 773, 777 (8th Cir. 2001); Berkey, at 1192. Regular and reliable attendance is a necessary element of most jobs and "an employee who is unable to come to work on a regular basis [is] unable to satisfy any of the functions of the job in question, much less the essential ones." Spankler, at 850 *quoting* Pickens, at 777.

Plaintiff argues that her tardiness is caused by her disabilities and that she is qualified to perform the essential functions of her job with the reasonable accommodations of either reassignment to another position or being given a part-time schedule. Assuming for the moment that plaintiff's tardiness is caused by her disabilities (a fact that has been clearly shown otherwise), these requested accommodations are not reasonable under the circumstances. Firstly, plaintiff has provided no medical documentation from any treating physician that these accommodations are necessary for her to perform the essential functions of her job; i.e., regularly

and reliably coming to work on time.[30]  Secondly, plaintiff has failed to demonstrate how these

accommodations would enable her to perform the essential function of her job by enabling her to

come to work on time.  An employer is not required to reassign the duties of other employees to

compensate for the unpredicted tardiness of the plaintiff.  Berkey, at 1192.  An employer is not

required to assign a disabled employee to another position if one is not available or if doing so

would thwart its policy to assign the best-qualified persons.  *See*, Berkey, at 1192; Ruiz v. Potter,

2009 WL 3229280, *12 (W.D.Mo. September 30, 2009); *see also*, U.S. Airways v. Barnett, 535

U.S. 391 (2002); Huber v. Wal-Mart Stores, 486 F.3d. 480, 483-84 (8th Cir. 2007); Young-

Parker v. A.T.& T Mobility Corp., 2009 WL 4884220, *3 (E.D.Ark. December 10, 2009)(*citing*

Huber for the proposition that an employer is not required to make accommodations that would

subvert other more qualified applicants for the job).  Plaintiff has failed to show any connection

between her disabilities and these requested Accommodations enabling her to be an "otherwise

qualified" employee able to perform the essential functions of her job.  Peebles v. Potter, at 768,

n.6 (The Court noting an overlap between consideration of plaintiff being an "otherwise qualified

individual" and the reasonableness of the requested accommodation and concluding that "if a

requested accommodation is unreasonable, then the employee has not shown `discrimination',

and he may not be an `otherwise qualified individual'"); *see also*, Joelson v. Department of

Veterans Affairs, 177 F.Supp.2d. 967, 972 (D.N.D. 2001)(When requested accommodation is

---

[30]Plaintiff continually argues that defendant has "all the medical documents" from prior
years; however, this is not relevant to the matter at hand.  Defendant has the right to request
current medical documentation supporting plaintiff's accommodation requests.  Plaintiff was
specifically informed of the need for this documentation as well as what it had to contain.  The
only physician statement received did not support these accommodation requests.

transfer to another position, plaintiff must point to an existing vacant position for which plaintiff is qualified and to which reassignment would not affect the VA's legitimate policies).[31]

Plaintiff also contends that the VA failed to engage in an interactive process to accommodate her disability by not discussing with her the implementation of allowing her to stand by her desk for a few minutes every hour. Firstly, the record clearly shows that plaintiff, herself, never made this request to the VA. The VA, on its own initiative, determined that this was a reasonable accommodation based on a physician's statement. On December 27, 2004 plaintiff submitted a written request for accommodation regarding her disability; she specifically requested a part-time schedule or reassignment to another position. Gov. Exhibit Z. As per VA policy, plaintiff was informed that she needed to submit medical documentation evidencing the need for the requested accommodation. Plaintiff was informed that the required medical documentation should contain, among other things, a detailed description of the exact medical condition and the medical basis for such a finding; a detailed explanation of the specific duties plaintiff is presently unable to perform due to her disability, a detailed description of the precise accommodation recommended by her health care provider; and a basis for the recommended accommodation especially as to how it will allow the plaintiff to perform the essential functions of her job. Gov. Exhibit Z-1. On January 27, 2005 plaintiff submitted a brief statement from Dr. Marsha Mertens which failed to meet most of the requirements as set forth in Government Exhibit Z-1; however, after referring only to plaintiff's spinal stenosis condition, Dr. Mertens states "[P]lease make accommodations for her so that she is able to take brief breaks from her

---

[31]The Court also notes that the record clearly shows that the VA was not opposed to accommodating plaintiff's reasonable requests. In the past, the VA had accommodated the plaintiff by providing her with handicapped parking spaces, allowing her to use a motor scooter at work, remodeling her workdesk, and allowing her to choose her work schedule with a later morning start time.

desk work." Gov. Exhibit Z-2. Thus, although this was never an accommodation sought by the plaintiff, the VA adjudged it to be a reasonable accommodation request and so informed Nordmoe.

However, plaintiff never took advantage of this accommodation prior to her termination from employment. She contends that it was incumbent upon Nordmoe to discuss this with her but fails to show the purpose of any discussion. A request to allow plaintiff to stand every hour for a few minutes was made, this request was approved, both Nordmoe and plaintiff was aware of the approval of the request. All that was left to do was for plaintiff to implement it. The Court finds that the VA did not fail to engage in the interactive process required; furthermore, caselaw does not impose liability merely for failing to fulfill this procedural aspect of the duty to reasonably accommodate. Peebles v. Potter, at 769-70.

### Plaintiff's Retaliation and Hostile Work Environment Claims

Plaintiff claims that the VA discriminated against her based on retaliation and/or hostile work environment by: 1) denying her leave requests after she filed an EEO complaint and when she was performing union duties on June 25, 2004; 2) charging her with AWOL for time spent preparing EEO testimony; 3) issuing incorrect telephone agent activity log reports to her; 4) meeting with plaintiff's union steward without her authorization or prior notice to her; 5) attempting to deny plaintiff eight (8) hours of time to respond to her proposed removal notice; 6) attempting to have the plaintiff sign a letter of alternative discipline in order to avoid a 3-day suspension without pay; 7) suspending plaintiff for 14 days; 8) issuing plaintiff a written counseling for plaintiff's use of approved leave; 9) calling plaintiff to over twenty (20) meetings in October 2004 which prevented her from doing her job; 10) charging plaintiff with AWOL for arriving less than seven (7) minutes late to work; 11) disciplining plaintiff regarding her absences

which led to her removal; 12) refusing to remove records of disciplinary actions from plaintiff's personnel file; 13) denying requested sick leave or annual leave when plaintiff provided medical documentation; 14) intimidating plaintiff by revoking a previously approved change in core time; 15) subjecting plaintiff to intolerable working conditions prompting her request for reassignment; and 16) refusing to reassign plaintiff and urging her to apply for disability retirement.  Plaintiff's Supplement to Complaint.

Once again, certain of the plaintiff's claims were never part of any administrative review; thus, they are administratively unexhausted.  Claims #3, #4, #6, #9, #14, and #15 will be dismissed for failure to exhaust administrative remedies.

A *prima facie* case of retaliation under the Rehabilitation Act consists of 1) protected activity; 2) a subsequent adverse employment action taken by the employer against the disabled employee; and 3) a causal link between the two.  Turner v. Gonzalez, 421 F.3d. 688, 696 (8th Cir. 2005); Joelson, at 972; Gage v. Potter, 2009 WL 5220159, *3 (E.D.Mo. December 31, 2009).  If plaintiff establishes a *prima facie* case, then the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision; once such a reason is articulated, the plaintiff must then show pretext.  Gage v. Potter, *supra.* (*citing* Takele v. Mayo Clinic, 576 F.3d. 834, 839 (8th Cir. 2009)).

As regards plaintiff's claims that the VA retaliated against her after filing an EEO complaint, charging her with AWOL on June 25, 2004 while performing union duties, charging her with AWOL for being less than seven (7) minutes late to work, and denying requested sick leave or annual leave when plaintiff had provided medical documentation, these claims are meritless.  Even if plaintiff could establish a *prima facie* case for these claims, the evidentiary record clearly demonstrates that plaintiff's unexcused absences were not in any way connected to

her disability. Furthermore, plaintiff provides no objective evidence to support any of her contentions that action was taken by the VA for the purpose of retaliating against her. For example, she contends that she was charged with AWOL on June 25, 2004 for engaging in union activities. Plaintiff, herself, admits that she had only told management (via an email) that she was taking a "late lunch", and that during this lunch she went to the Union office and the Union representative asked her to perform some Union work. She further admits that the Union representative "called a management official and requested additional time for Ms. Stipe to continue her Union duties. Apparently, that Union official did not notify Mr. Nordmoe of the approved additional time for the Plaintiff to perform **[sic]** Union duties." Plaintiff's Amended Response [61], ¶27. Thus, plaintiff took an extended lunch unbeknownst to management, then took additional time for "Union duties" again unbeknownst to management. Again, the evidentiary record clearly supports the VA's legitimate, nondiscriminatory reasons; i.e., unexcused tardiness, for charging plaintiff with AWOL. This is the same as to all her claims of retaliation - the evidentiary record is solid as to the VA's legitimate, nondiscriminatory reasons for charging her with AWOL and the plaintiff has offered nothing but unsupported, broad, speculative accusations that the acts were retaliatory in nature. Plaintiff has failed to prove that the VA's reasons for charging her AWOL were pretextual for disability discrimination.

As for plaintiff's claims that the VA retaliated against her by suspending her for fourteen (14) days, issuing her a written counseling for her use of approved leave, disciplining her for her absences (which she contends led to her removal) and refusing to remove incidents of disciplinary action from her personnel file; these claims also fail. Once again, the evidentiary record before this Court clearly supports the VA's legitimate, nondiscriminatory reasons for taking the referenced disciplinary actions, and plaintiff has failed to set forth any affirmative

evidence which demonstrates that the reasons for the disciplinary actions were pretextual for disability discrimination.

In conclusion, plaintiff has failed to offer any relevant caselaw or record evidence that she engaged in any statutorily protected activity (other than the filing of an EEO complaint), a necessary element of a *prima facie* case. Furthermore, she has failed to provide any record evidence that any action taken by the defendant was motivated by her disability. Finally, even if plaintiff could establish a *prima facie* case of retaliation, she has failed to provide any relevant caselaw or record evidence that the VA's reasons for its actions were a pretext for retaliation in connection with her disability.

Plaintiff next contends that the VA attempted to deprive her of eight hours time to respond to her proposed removal, subjected her to a "continuing pattern of harassment, intimidation, and denial of a benefit that led to the intolerable working conditions" prompting her to request reassignment, and refusing to reassign plaintiff and "urging her to apply for disability retirement". Firstly, the evidentiary record clearly shows that no one at the VA intentionally set out to deprive the plaintiff of her eight hours to respond to the removal proposal. The undisputed evidence shows that due to a misunderstanding over a series of emails, the initial eight hours had not been approved, but ultimately was restored to the plaintiff. Thus, plaintiff cannot establish a *prima facie* case because no adverse employment action took place which materially adversely impacted upon the plaintiff's employment terms or conditions.

In order for the plaintiff to succeed on her hostile work environment due to harassment on account of her disability, plaintiff must show that: 1) she is a qualified individual with a disability; 2) she was subject to unwelcome harassment; 3) the harassment was based on her disability or a request for accommodation; 4) the harassment was sufficiently severe or pervasive

to alter the conditions of her employment and to create an abusive working environment; and 5) the employer knew of or should have known of the harassment and failed to take prompt remedial action. *See*, Shaver v. Independent Stave Co., 350 F.3d. 716, 720 (8th Cir. 2003)(Eighth Circuit recognizes that a hostile work environment claim can be cognizable under the ADA); Hiller v. Runyon, 95 F.Supp.2d. 1016, 1022-24 (S.D.Iowa April 13, 2000)(assuming existence of a hostile work environment claim under the Rehabilitation Act); Rouillard v. Potter, 2003 WL 21026814 (D.Minn. May 5, 2003)(hostile work environment claim under the Rehabilitation Act). Evidence of a hostile work environment is based on the totality of the circumstances of the work environment. Delph v. Dr. Pepper Bottling Co. of Paragould, Inc., 130 F.3d. 349, 355 (8th Cir. 1997). For harassment to affect a term, condition or privilege of employment, it must have been "so severe or pervasive s to alter the conditions of the victim's employment and create an abusive working environment." Hiller, at 1026 *quoting* Wallin v. Minnesota Dept. of Corrections, 153 F.3d. 681, 688 (8th Cir. 1998)(citations omitted); *see also*, Jeseritz v. Potter, 282 F.3d. 542, 547 (8th Cir. 2002) *citing* Wallin, *supra.* Finally, the harassment must be sufficient to create an objectively hostile environment. Palesch v. Missouri Comm'n on Human Rights, 233 F.3d. 560, 566 (8th Cir. 2000).

The two primary issues which essentially invalidate plaintiff's claim of disability discrimination harassment is that 1) plaintiff is not "otherwise qualified" under the Rehabilitation Act; and 2) plaintiff cannot generate a genuine issue of material fact on the requisite severity or pervasiveness of the hostile or abusive work environment because the evidence she relies upon is the same evidence she relies upon, unsuccessfully, to show a failure to accommodate.

Plaintiff's basic contention is that she was subjected to a hostile work environment because her numerous continuing requests for sick leave or annual leave were rejected; and that

some of these rejections were due to the VA's rejection of her "medical documents". This was also the basis of her failure to accommodate claim. However, since this Court has found that, under the circumstances of this case, that plaintiff's "record evidence" did not create a material issue of fact on the requisite element of attendance at work being an essential element of her job, and her requested accommodations were not supported sufficiently to demonstrate that they would enable her to meet this requisite element; it is axiomatic that this same "record evidence" cannot reasonably support a claim of harassment because of disability that was so "severe or pervasive" as to create a hostile work environment. *See*, <u>Martinez v. Cole Sewell Corp.</u>, 233 F.Supp.2d. 1097, 1136 (N.D.Iowa December 6, 2002).

Secondly, the VA's rejection of her leave requests could not be considered objectively so "severe or pervasive" as to alter the conditions of plaintiff's work environment because she continued to arrive to work late on a regular basis. There is no evidence on the record that plaintiff considered the VA's actions to be so abusive that it affected a term, condition, or privilege of her employment. The record instead shows that plaintiff continually battled her supervisors refusing to abide by their requests and written counseling that she come to work on time.

Plaintiff has failed to generate a genuine issue of material fact that she was subjected to disability harassment that was sufficiently "severe and pervasive" to sustain her hostile work environment claim.

Finally, plaintiff has an obtuse claim regarding "involuntary contrustive disability retirement". She contends, without any supporting evidence, that she was "forced" to take disability retirement and/or her disability retirement was improperly delayed. Firstly, the evidence record clearly shows that any delay in processing the plaintiff's termination papers were

due solely to her failure to complete the paperwork in a timely manner. Once she completed the paperwork as required, it was processed in the normal course of business. Secondly, plaintiff was not "constructively discharged or retired", her employment was actually terminated for excessive chronic tardiness and workplace misconduct. This claim also fails.

Plaintiff has failed to provide any relevant caselaw and/or record evidence in order to create a genuine issue of material fact regarding any of her disability discrimination (and her secondary age discrimination) claims. Her "evidence" consists of unsubstantiated accusations, speculative reasoning, and her subjective opinions. She does not dispute that agency policy rightfully requires specific medical information to support her numerous leave requests and/or her request(s) for accommodation. She simply argues that whatever she provided should have been sufficient. She consistently argues that past documentation (some of which was several years old) should have been adequate but provides no reasonable legal justification for this argument. She contends that other employees were provided leave requests but fails to offer any objective evidence identifying these other non-disabled "similarly-situated" employees for agency review or for this Court's review.[32] She consistently argues that she "never missed a day of work" but that is irrelevant because the reasons for the disciplinary actions, and her ultimate

---

[32]She failed to identify any non-disabled "similarly-situated" employees who were given favorable treatment in connection with her administrative reviews. However, before this Court, she submitted as an exhibit with her amended response a copy of an e-mail sent to another employee (Rosalyn Pearson-Clark) who plaintiff claims was also chronically tardy but not fired. This e-mail fails to provide any evidence of "chronic tardiness" by Ms. Pearson-Clark to the degree shown by the plaintiff. Contrary to the plaintiff's assertions of different treatment, this e-mail shows that Nordmoe informed Ms. Pearson-Clark that she needed to "refrain from coming in late and then presenting an unscheduled leave request." Gov. Exhibit CCC (attached to VA's reply to plaintiff's amended response [64]). Furthermore, it informs Ms. Pearson-Clark that unscheduled leave requests are not subject to approval and reemphasizes the need to be at work on time. This was the same type of counseling that Nordmoe attempted with the plaintiff for many months without any improvement in plaintiff's conduct.

removal, was her excessive chronic tardiness and unprofessional workplace conduct. She contends that the VA failed to accommodate her but the record evidence belies this fact - she was accommodated in a number of ways when her disability was sufficiently medically documented and supported as to the need for a reasonable accommodation, such as, a scooter for her mobility, a handicapped parking space, a modified desk, and a change in her core worktime[33]. As the ALJ noted, and this Court concurs, the record evidence shows that there was no reasonable accommodation available which would address the misconduct at issue (chronic tardiness and threatening physical harm to a supervisor). In fact, her supervisors testified that plaintiff was capable of performing her job **when she came to work**. The evidence record shows, as the ALJ found, and this Court concurs that "the appellant's [Ms. Stipe] supervisors displayed remarkable patience in addressing the appellant's attendance problems and disruptive behavior." Gov. Exhibit E, pg. 14.

Plaintiff has failed to create any material issues of fact regarding the substantial evidence supporting the MSPB's final decision upholding the VA's removal of plaintiff. Thus, the MSPB's final decision was not arbitrary, capricious or an abuse of discretion. Plaintiff has further failed to create any material issues of fact that all disciplinary actions taken by the VA were not the result of disability or age discrimination or taken in retaliation or part of a pattern of disability discrimination harassment creating a hostile work environment. Defendant is entitled to summary judgment on all of plaintiff's claims as a matter of law.

---

[33]Plaintiff also argues that she never asked for a late work shift and insinuates that her assigned workshift was involuntary. However, her own exhibit shows otherwise. Plaintiff's Exhibit LLL is an e-mail dated December 4, 2001 in which plaintiff acknowledges that the VA management told her she could request a change in her core time later than 9:00 a.m. for medical reasons. Plaintiff, in this email, requests a core time change to 9:15 a.m to allow her to come in between 9 a.m. and 9:15 a.m. This request was approved, and in fact, she was allowed to change it further to a later core time of 9:30 a.m.

Dated this 18th day of February, 2010.

STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE